Neang NORNG, Plaintiff,

v.

Donna E. SHALALA, Secretary of Health and Human Services, Defendant.

No. C94–4054.

United States District Court,
N.D. Iowa,
Western Division.

March 3, 1995.

Wilford L. Forker, Sioux City, IA, for Neang Norng.

Timothy T. Jarman, Asst. U.S. Atty., Sioux City, IA, for Donna Shalala.

ORDER REVERSING AND REMAND-
ING THE CASE TO THE SECRE-
TARY FOR FURTHER REVIEW

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION                                                              1202

   A. Factual background                                            1202
   B. The court's jurisdictional basis                             1207
   C. Procedural background                                        1208

II. ANALYSIS                                                                 1208

   A. The "substantial evidence" standard                          1208
   B. The Polaski standard and subjective pain credibility determinations   1209
   C. Relative burdens of proof                                    1210

     1. The ALJ's analysis of Norng's subjective pain complaints   1210

       a. Alleged inconsistencies regarding cooking and shopping   1211
       b. Alleged discrepancies regarding Norng's motivation to work   1214
       c. Alleged inconsistencies regarding Norng's pain on December 1, 1992 and his pain on May 20, 1993   1215
       d. Alleged inconsistencies regarding Norng's pain on November 3, 1992 and his pain on November 10, 1993   1216

     2. The credibility of Norng's son-in-law                      1216
     3. The ALJ's "sit and squirm" analysis                        1219
     4. The hypothetical questions                                 1221

       a. Vocational analysis required                              1221

III. CONCLUSION                                                             1223

The court has before it plaintiff's resisted appeal from the Secretary's denial of his application for Supplemental Security Income (SSI) benefits pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* The case presents the issue of whether the Secretary had before her substantial evidence from which she could determine that the plaintiff was not disabled. For reasons stated below, the court is persuaded that the Secretary did not have substantial evidence justifying a denial of plaintiff's claim of disability and that this case must be reversed and remanded for further review.

## I. INTRODUCTION

### A. Factual background

The plaintiff in this case is Neang Norng, a 59 year old Sioux City, Iowa man who is five feet, six inches tall and who weighs approximately 135 pounds. (*Tr. 49*). Until 1990, Norng was a farmer in Cambodia. (*Tr. 96*). He has two years of Cambodian education and can "read and write a little bit" in that language, but can do neither in English. (*Tr. 51*). He does not have a driver's license. (*Tr. 49*). Norng receives financial assistance from the State of Iowa (more than $400/month in welfare and $327/month in food stamps) based on his wife's inability to work. (*Tr. 50*).

Norng began working at Iowa Beef Processors ("IBP"), a beef packing plant in Dakota City, Nebraska, in April 1990 and he worked there until November 1992. (*Tr. 119*). At IBP, Norng worked as a meat cutter, trimming fat from beef as it came down an assembly line (*Tr. 53*), then as a clean-up person, sweeping the trimmed fat

from the floor with a broom and dust pan. (*Tr. 71*). His job involved eight hours of walking and standing, constant bending and no sitting. (*Tr. 120*).

On November 14, 1992, Norng was injured in an automobile accident. (*Tr. 148–54*). Norng had been in the front passenger's seat and was not wearing his seat belt when the car flipped over. (*Tr. 153*). As a result of injuries sustained in the accident, Norng was admitted at the Marian Health Center (hereinafter "Marian") in Sioux City where x-ray examinations revealed that he suffered fractures of his second, third, fifth, sixth and seventh ribs, as well as a small, left pleural effusion.[1] (*Tr. 155, 161*). He also suffered a contusion[2] of his right shoulder. (*Tr. 175*). After being released, Norng complained of residual back and chest pain, and was treated for that pain by Dr. Paul Johnson at Marian.

Two weeks after the accident, on November 17, 1992, Norng went to Marian for a check-up "complaining of lots of left chest pain." *Id.* At that time, Dr. Johnson stated that "(w)e evaluated his chest many times in the hospital and each times [*sic*] the x-rays simply showed the rib fractures. I still think that is what his pain is, that plus muscle aches." *Id.* In order to alleviate the pain, Dr. Johnson prescribed Motrin 400 mg. for 10 days as well as Tylenol # 3. *Id.*

On December 4, 1992, Norng had a follow-up visit with Dr. Johnson during which Norng stated that he was "still having a lot of rib pain" but was "a little bit better." *Id.* Dr. Johnson prescribed Advil and Tylenol # 3 (at a dosage of four per day) again, with one refill. *Id.* On December 28, 1992, Dr. Johnson wrote a letter to Wesley Drahozal of the Iowa Disability Determination Services Bureau in which he stated that Norng had spent seven days in the hospital recuperating from the auto accident and "on my last visit on 12/14/92, patient continued to have marked pain in his left rib cage. I plan to keep him off work until this is better.... At this time, patient really cannot do any work. Hopefully, this will change soon." (*Tr. 176*).

On January 7, 1993, Norng came in for another check-up and stated that he was better than he had been a month before, but was still experiencing anterior[3] chest pain and did not feel that he could go back to work. (*Tr. 175*). In his report, Dr. Johnson stated that "(p)atient's interpreter did talk about the disability and how he needs to be on permanent disability and the fact that his wife can't work." *Id.* Dr. Johnson changed Norng's medications by ceasing to prescribe Tylenol # 3 and replacing it with Ibuprofen. *Id.* Dr. Johnson also told Norng not to go back to work for the next month, but to return to his office in four weeks for another check-up. *Id.*

On January 29, 1993, Norng came back to Dr. Johnson's office and was still complaining of "a lot of pain in his chest and also in his lower back." *Id.* Dr. Johnson concluded that Norng would have to undergo chest and back x-rays, and remain out of work. *Id.* Plaintiff's x-rays came back negative, except that there were signs of a pneumatocele[4] in the upper portion of his lungs which the radiologists "think needs to be followed three months with a follow up x-ray." (*Tr. 177*). In his notes of Norng's February 18, 1993 check-up, Dr. Johnson wrote that despite the negative x-ray results

> Patient none the less [*sic*] continues to complain of pain perispinal[5] and in the left chest. This is very difficult to evaluate because of the language barrier. I really feel that there is nothing else to do with the chest pain. I do think that that will eventually improve.... Patient wanted to know about going to a chiropractor and I felt that that would be appropriate.

*Id.*

On February 19, 1993, Norng was seen by Dr. W.J. Wagner of the Wagner Chiropractic

---

1. A pleural effusion involves the escaping of some fluid from the membrane surrounding the lungs. *Dorland's Illustrated Medical Dictionary* (27th ed.) 532, 1309.

2. A contusion is a bruise. *Dorland's* at 378.

3. The anterior area is the front area. *Dorland's* at 95.

4. A pneumatocele is defined as "a usually benign, thin-walled, air-containing cyst of the lung...." *Dorland's* at 1317.

5. Perispinal means around the spine. *Dorland's* at 1256.

Clinic in Sioux City, Iowa. After full neurological, orthopedic and chiropractic examinations, Dr. Wagner diagnosed Norng as having a displaced lumbar disc, sciatica,[6] low back syndrome, thoracic[7] sprain/strain, thoracic radiculitis,[8] pain in the thoracic spine, brachial[9] radiculitis, headaches and cervicalgia.[10] (*Tr. 172*). Dr. Wagner stated that Norng had "had a good response with chiropractic care," and estimated that "(i)t is very likely that there will be permanent impairment with soft tissue residuals in this area of the spine." *Id.* Dr. Wagner concluded that Norng should undergo "six to twelve" months of continued chiropractic therapy "before a competent estimation of any degree of disability can be made." *Id.*

Per Dr. Johnson's orders, Norng was still home from work on March 26, 1993. (*Tr. 177*). As of August 10, 1993, Norng was still complaining of chest and lower back pain and was referred to the Marian Back Clinic ("back clinic"). *Id.* On August 19, 1993, Norng was seen by Dr. Jay T. Strittholt of the back clinic. During Dr. Strittholt's physical examination, Norng stated that he had

> some dizziness and headaches which seems [*sic*] to come on when the pain becomes worse. He notes that bending and lifting seems to increase the pain. He often times uses a hot shower for relief but states that it doesn't completely remove the feeling that he has. He describes it primarily with pain in the mid portion of his lumbar spine although [he] describes pain throughout the entire body. He notes some weakness when he tries to walk. Some numbness which seems to be mainly in the posterior calf and into the plantar aspect[11] of the foot, right greater than left. This seems to go onto the plantar surface.

(*Tr. 173*). Dr. Strittholt examined Norng's back and found "areas of tenderness diffusely throughout the entire low back region. This seems to be worse right over the central portion of the mid lumbar." *Id.* Nonetheless, Dr. Strittholt found that Norng's flexion[12] and extension were "intact" with "only slight limitation." *Id.* Dr. Strittholt also determined that Norng's reflexes were "symmetrical" and that his lower back showed no bony abnormalities. *Id.* Dr. Strittholt stated that Norng would need to undergo a Magnetic Resonance Imaging ("MRI") examination of his lumbar area in order to determine whether there were any changes in that area of his back. *Id.*

The MRI examination was performed soon thereafter and on August 26, 1993 Dr. Strittholt stated that it "showed no evidence of significant abnormality" (*Tr. 174*) but Norng nonetheless continued to complain of pain in his right lower back. *Id.* Accordingly, Dr. Strittholt prescribed Motrin 800 mg. and physical therapy. *Id.* Just as Dr. Johnson had concluded that he didn't think there was a whole lot which could be done to alleviate Norng's pain, Dr. Strittholt similarly concluded that, aside from the pain medication and physical therapy, "I don't really feel that there is anything else to offer him unless we could get a more accurate history, which I think is impossible at this stage. Will see him back here again should anything change." *Id.*

On September 8, 1993, Dr. Johnson wrote a letter to Norng's attorney, Wil L. Forker, in which he reviewed Norng's back pain history and noted that during the months which followed the automobile accident, Norng "has continued to have chronic pain in his left chest. This is in the area of his fractures. By now his fractures should have healed.

---

6. Sciatica is defined as "a syndrome characterized by pain radiating from the back into the buttock and into the lower extremity...." *Dorland's* at 1494.

7. The term "thoracic" is defined as "pertaining to or affecting the chest." *Dorland's* at 1715.

8. Radiculitis is defined as "inflammation of the root of a spinal nerve, especially of that portion of the root which lies between the spinal cord and the intervertebral canal." *Dorland's* at 1405.

9. Brachial is defined as "pertaining to the arm." *Dorland's* at 229.

10. Cervicalgia is a term relating to a painful condition relating to the neck. *Dorland's* at 46, 307.

11. The Plantar aspect is the sole of the foot. *Dorland's* at 1303.

12. Flexion is the act of bending. *Dorland's* at 641.

Nonetheless, he continues to have pain." (*Tr. 178*). Dr. Johnson also stated that he had recently attempted to treat Norng's pain complaints with steroid and Marcaine injections and concluded that "(a)s far as the patient's overall prognosis, I would have felt that his pain should have improved by now. As such, I have no opinion on how much longer his chest pain will continue." *Id.*

Norng has not worked since the automobile accident and he testified[13] at a January 14, 1994 hearing before Administrative Law Judge Bruce Mazzarella ("the ALJ") that his back pain prevented him from working. (*Tr. 54–55*). He also testified that he is not working because he is caring for his wife. (*Tr. 65*). Norng stated that his pain is constant, though it is helped "a little bit" by his medications. (*Tr. 57*).

Norng testified that he could only sit or stand for less than 30 minutes at a time, could only walk a distance of one and a half blocks and could only lift between two and three pounds at a time because of his shoulder pain. (*Tr. 59*). In terms of every day activities, Norng testified that he has no hobbies (*Tr. 62*), so he spends most of his time during the day reclining on the sofa watching television (*Tr. 62*), watching Cambodian videos (*Tr. 62–63*) and listening to Cambodian music. (*Tr. 66*). Norng also testified that he does "a little bit" of cooking (*Tr. 61*) such as barbecuing or making sour sauce, that he goes grocery shopping (*Tr. 62*) and that he does some house cleaning (*Tr. 61*), but that he does not do laundry or other house work. *Id.*

In addition to testifying in his own behalf, Norng also had his son-in-law, Choeun Kan, testify as a witness at the hearing. Kan testified that he generally sees his father-in-law on the weekends and one time a week but that, depending on his work schedule, he may see Norng more often than that. (*Tr. 73–74*). Kan testified that Norng complains of pain in the ribs, the lower back and the right shoulder. (*Tr. 75*). Kan also testified that his father-in-law "cannot sit too long and sometimes just lay[s] down and when he wake[s] up he [finds it] too hard to wake up...." *Id.* Kan estimated that Norng can

only sit for a maximum of 15 to 20 minutes at a time. (*Tr. 76*).

Kan also testified that he has seen Norng cook, but that he has not seen Norng clean the house. (*Tr. 77*). Further, Kan testified that he takes Norng shopping, and that when Norng shops he will only "buy a little bit and take it back home." (*Tr. 78*). Kan explained that Norng cannot do large-scale shopping, such as an entire week's worth of grocery shopping, at one time because "you know the big, something like Saturday, Sunday, there are a lot of people, he cannot walk too long, we just get out in the morning and it's not too many people, just buy a little bit, and just go down to like the express lane or something like that." (*Tr. 79*). Kan explained that Norng cannot wait in long lines because "he cannot wait too long, like his back hurt[s] and he cannot stand too long, you know, just waiting for the line.... Because his back and his body hurt." (*Tr. 80*).

Sandra Trudeau testified at the hearing as a vocational expert. Trudeau testified that Norng is considered under the Code of Federal Regulations to be a person of "advanced age." (*Tr. 86*). She also testified that he is illiterate in English and that he has a marginal Cambodian education. *Id.* Trudeau testified that Norng's meat cutting job is in the exertional category of "medium" under the regulations and that the clean-up job is within the "light" exertional level category. Both jobs, she said, were unskilled positions under the regulations. (*Tr. 87*). As well, Trudeau testified that Norng's work as a farmer in Cambodia would be considered under the regulations to be "generally" heavy and unskilled. *Id.*

When asked to assume that Norng's condition was as he described in his testimony, Trudeau stated that he could no longer return to any of his past relevant work. (*Tr. 88*). Specifically, the following exchange occurred between the ALJ and Trudeau:

Q. All right, I want you to assume some things for me, okay. I want you to assume, based upon the face value of

**13.** Norng testified through the use of an inter-

preter named Po Pun at the ALJ hearing *(Tr. 43).*

the claimant's testimony and the testimony of his witness, that the claimant has all the impairments that he's testified to, and tells us that he can sit for less than 30 minutes, stand for less than 30 minutes, can't alternate sitting and standing for eight hours, walk up to one half block, lift up to two to three pounds of, and although I didn't ask him, I assume that he could carry that two to three pounds. Based upon the exertional limitations that he's expressed could he return to any of his past relevant work, either as a meat trimmer or as a farmer?

A. No, he could not.

Q. And the simple reason for that would be what?

A. That he would need to stand longer than 30 minutes at a time, and he would not be able to alternate sit or standing, and the lifting requirements. He would need to lift more than three pounds.

Q. Could he do any other work in the national economy based upon his expressed limitations?

A. No, he could not.

(*Tr. 87–88*).

After receiving that answer, the ALJ changed the hypothetical as follows:

Q. I want you to assume a claimant with the profile that you've given us. And assume I do find that he has some of the impairments that he's testified to, but not necessarily all of the symptoms and limitations that he's expressed. I want you to assume within twelve months of his onset I would find that he could sit without restriction, stand and walk without restriction, lift up to 50 pounds on an occasional basis and carry up to 50 pounds on an occasional basis. I want you to assume that he has some residual back discomfort, and rib discomfort, and should not engage in constant cycles of bending beyond 45 degrees. I want you to assume that he does have some complaints of dizziness with postural changes from sitting to standing, and

should not engage in frequent cycles of changing of posture from sitting to standing. I want you to assume that although he complains of constant pain I would expect no more than a moderate interference in the performance of complex or varied tasks, with no impediment on simple routine and repetitive tasks. Based upon that hypothetical would he be able to return to either his work as a meat trimmer or a farmer?

A. Yes, he would be able to return to his job as a meat trimmer.

Q. Both as performed in the national economy and as he performed it?

A. Yes.

Q. And if I lowered his restrictions to 25 pounds of lifting and carrying, would be able to return to any of his past relevant work as he performed it, or as performed in the national economy?

A. Yes.

Q. What could be he do?

A. He would be able to perform the meat trimmer.

Q. As he performed it or as performed in the national economy at 25 pounds?

A. As performed in the national economy.

Q. Because I thought you told me that was medium as performed in the national economy?

A. Yes it is.

Q. But it's still within 25 pounds?

A. Yes.

\* \* \* \* \* \*

Q. Okay. I'm going to give you another hypothetical. And I want you to assume sitting without restriction, standing and walking without restriction, lifting and carrying up to 25 pounds. Assume the same restriction with regard to back, and that he shouldn't engage in constant cycles of bending beyond 45 degrees, should not engage in frequent changes of posture from sitting to standing. I want you to assume that he also has some residual right dominant arm and shoulder diffi-

culty, and should not engage in constant reaching above his shoulder level. Would he still be able to do the meat trimmer's job?

A. Yes.

(*Tr. 88–90* ).

In his decision, the ALJ determined that Norng is not "disabled" under the Social Security Act. The ALJ based his determination on the fact that Norng's testimony was not credible, that Norng's son-in-law's testimony was not credible, that the medical reports in the record showed no objective basis for Norng's pain complaints and that the medical report submitted by Norng's chiropractor, Dr. Wagner, was not persuasive. The ALJ therefore concluded that Norng retains the residual functional capacity to return to his meat trimmer job. (*Tr. 26* ). With this factual background in mind, the court will now review its jurisdictional basis for hearing this case, the procedural background of this case, then discuss the ALJ's ruling.

### B. The court's jurisdictional basis

This is a proceeding under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.* Section 1383(c)(3) of Title 42 of the United States Code provides that "(t)he final determination of the Secretary after a hearing ... shall be subject to judicial review as provided in section 405(g) of this title...." 42 U.S.C. § 1383(c)(3) pocket part 1994). In pertinent part, 42 U.S.C. § 405(g) states the following:

Any individual, after any final decision of the Secretary made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow. Such action shall be brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have

his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.... The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with or without remanding the cause for a rehearing. The findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive.... The judgment of the court shall be final except that it shall be subject to review in the same manner as a judgment in other civil actions....

42 U.S.C. § 405(g) (pocket part 1994).

Accordingly, the court has the power to remand or reverse the ALJ's decision, and "(w)here the record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which plaintiff is entitled, reversal is appropriate." *Thompson v. Sullivan,* 957 F.2d 611, 614 (8th Cir.1992) (citing *Fowler v. Bowen,* 866 F.2d 249, 253 (8th Cir.1989)); see also *Simmons v. R.R. Retirement Bd.,* 982 F.2d 49, 57 (2d Cir.1992) (citing *Thompson,* 957 F.2d at 614; *Parker v. Harris,* 626 F.2d 225, 235 (2d Cir.1980) (reversal proper where remand "would serve no purpose")); *Gavin v. Heckler,* 811 F.2d 1195, 1202 (8th Cir.1987) (reversal proper where "remand would be a futile gesture"). The court cannot, however, grant a remand merely because it is unhappy with the ALJ's result, *Melkonyan v. Sullivan,* 501 U.S. 89, 100–01, 111 S.Ct. 2157, 2164–65, 115 L.Ed.2d 78 (1991), or " 'because substantial evidence would have supported an opposite decision.' " *Barrett v. Shalala,* 38 F.3d 1019, 1022 (8th Cir.1994) (quoting *Smith v. Shalala,* 987 F.2d 1371, 1374 (8th Cir.1993) *which, in turn,* quoted *Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir.1984)). Further, in order to remand a case, such as this one, which falls under sentence four of 42 U.S.C. § 405(g),[14] the court must either affirm, modify or reverse the decision so that it will be considered a final judgment. *Melkonyan,*

---

14. Sentence four of § 405(g) provides that:
    The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or re-

versing the decision of the Secretary, with or without remanding the cause for a rehearing. 42 U.S.C.A. § 405(g) (pocket part 1994).

501 U.S. at 102, 111 S.Ct. at 2165; *see also Shalala v. Schaefer*, —— U.S. ——, ——, 113 S.Ct. 2625, 2629, 125 L.Ed.2d 239 (1993). With this jurisdictional basis in mind, the court now turns to the procedural history of this case and the standards to be applied upon review.

### C. Procedural background

Norng filed his application for SSI benefits on December 1, 1992. (*Tr. 96–99*). The application was denied initially on January 19, 1993 (*Tr. 100–02*) and after reconsideration on July 21, 1993. (*Tr. 105–07; 141–42*). An administrative hearing was held in this matter on January 14, 1994, after which the ALJ ruled, on February 25, 1994, that Norng was not disabled and therefore not entitled to SSI benefits. (*Tr. 26*). On March 16, 1994, Norng requested a review of the ALJ's decision from the Social Security Administration Appeals Council. (*Tr. 5*). On June 3, 1994, the Appeals Council denied Norng's request and stated that "the Administrative Law Judge's decision stands as the final decision of the Secretary in your case." (*Tr. 3*). Since the Appeals Council's June 3, 1994 letter stated that it represented the final determination of the Secretary, and since Norng filed this action on June 30, 1994, there is no dispute that it was timely filed with this court. Therefore, Norng is entitled to a review of his case under 42 U.S.C. § 405(g), *supra*. The court will accordingly commence to review the Secretary's decision in accordance with § 405(g) by determining whether that decision was supported by substantial evidence.

### II. ANALYSIS

#### A. The "substantial evidence" standard

■ The Eighth Circuit's standard of review in Social Security cases is well-established. This Court must affirm the findings of the ALJ if they are supported by substantial evidence in the record as a whole. *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir.1994) (citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)); *Nelson v. Sullivan*, 966 F.2d 363, 366, n. 6 (8th Cir.1992) (citing *McMillian v. Schweiker*, 697 F.2d 215, 220 (8th Cir.1983));

42 U.S.C. § 405(g). " 'Substantial evidence is less than a preponderance'. . ." *Orrick v. Sullivan*, 966 F.2d 368, 371 (8th Cir.1992) (quoting *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir.1992)), but " 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Perales*, 402 U.S. at 401, 91 S.Ct. at 1427 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)); *see also Smith*, 31 F.3d at 717 (citing *Ghant v. Bowen*, 930 F.2d 633, 637 (8th Cir.1991)). Put another way, "(t)he standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.' " *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir.1994) (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir.1991)).

■ When evaluating the evidence in an appeal from the Secretary's denial of benefits, the court must perform a balancing test, evaluating any contradictory evidence. *Sobania v. Secretary of HHS*, 879 F.2d 441, 444 (8th Cir.1989) (citing *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir.1987)). "(I)f it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, [this court] must affirm the [Secretary's] decision." *Orrick*, 966 F.2d at 371. Even if this court "might have weighed the evidence differently, [it] may not reverse the Secretary's decision when there is enough evidence in the record to support either outcome." *Culbertson*, 30 F.3d at 939 (citing *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir.1992)). In other words, the court "must consider evidence that detracts from the Secretary's decision as well as evidence that supports it. [The court] may not, however, reverse the Secretary's decision merely because substantial evidence also would have supported an opposite decision." *Frankl v. Shalala*, 47 F.3d 935, 937 (8th Cir.1995) (citing *Smith*, 987 F.2d at 1373–74 (8th Cir.1993)).

"Review under this standard is not a rubber stamp for the ALJ, however." *Griffon v. Bowen,* 856 F.2d 1150, 1153 (8th Cir. 1988) (citing *McMillian,* 697 F.2d at 220). The Court must at all times keep in mind that prior to granting or denying benefits, the ALJ has a duty to fully and fairly develop the record. This mandate was recently summarized as follows:

> The Secretary acknowledges that it is her " 'duty to develop the record fully and fairly, even if ... the claimant is represented by counsel.' " *Boyd v. Sullivan,* 960 F.2d 733, 736 (8th Cir.1992) (quoting *Warner v. Heckler,* 722 F.2d 428, 431 (8th Cir.1983)). This is so because an administrative hearing is not an adversarial proceeding. *Henrie v. Dep't of Health & Human Serv.,* 13 F.3d 359, 361 (10th Cir. 1993). "[T]he goals of the Secretary and the advocates should be the same: that deserving claimants who apply for benefits receive justice." *Sears v. Bowen,* 840 F.2d 394, 402 (7th Cir.1988). Moreover, "[a]n adequate hearing is indispensable because a reviewing court may consider only the Secretary's final decision [and] the evidence in the administrative transcript on which the decision was based."

*Battles v. Shalala,* 36 F.3d 43, 44 (8th Cir. 1994) (quoting *Higbee v. Sullivan,* 975 F.2d 558, 562 (9th Cir.1992) (per curiam)). With these standards in mind, the court will now turn to the ALJ's evaluation of Norng's case.

**B.  The Polaski standard and subjective · pain credibility determinations**

"An ALJ's credibility determinations are, of course, entitled to considerable weight." *Young v. Secretary of Health and Human Servs.,* 957 F.2d 386, 392 (7th Cir. 1992) (citing *Cheshire v. Bowen,* 831 F.2d 687, 690 (7th Cir.1987)); see also *Gooch v. Secretary of Health and Human Servs.,* 833 F.2d 589, 592 (6th Cir.1987), *cert. denied,* 484 U.S. 1075, 108 S.Ct. 1050, 98 L.Ed.2d 1012 (1988); *Hardaway v. Secretary of Health and Human Servs.,* 823 F.2d 922, 928 (6th Cir.1987). Nonetheless, in the Eighth Circuit, an ALJ may not discredit allegations of pain merely because of a lack of objective evidence; instead, he may discredit subjective complaints of pain only if they are incon-

sistent with the record as a whole. *Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir.1994); see also *Bishop v. Sullivan,* 900 F.2d 1259, 1262 (8th Cir.1990) (citing *Polaski v. Heckler,* 739 F.2d 1320 (order), *supplemented,* 751 F.2d 943 (8th Cir.1984), *vacated,* 476 U.S. 1167, 106 S.Ct. 2885, 90 L.Ed.2d 974 *adhered to on remand,* 804 F.2d 456 (8th Cir.1986), *cert. denied,* 482 U.S. 927, 107 S.Ct. 3211, 96 L.Ed.2d 698 (1987)). Under *Polaski,*

> The adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as:
>
> 1) the claimant's daily activities;
>
> 2) the duration, frequency and intensity of the pain;
>
> 3) precipitating and aggravating factors;
>
> 4) dosage, effectiveness and side effects of medication;
>
> 5) functional restrictions.

*Polaski,* 739 F.2d at 1321–22. In other words, under *Polaski,* an ALJ is free to doubt a claimant's subjective pain complaints. However, he must support a denial of benefits based on a consideration of the above-mentioned five factors. Indeed, the *Polaski* court stated that "(t)he adjudicator is not free to accept or reject the claimant's subjective complaints *solely* on the basis of personal observations. Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole." *Id.* (*emphasis in original* ).

As the Tenth Circuit has stated, "(t)o establish disabling pain without explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony evaluated by the ALJ and weighed alongside the medical evidence." *Huston v. Bowen,* 838 F.2d 1125, 1131 (10th Cir.1988) (citing *Luna v. Bowen,* 834 F.2d 161, 164 (10th Cir.1987)); *Cotton v. Bowen,* 799 F.2d 1403, 1407 (9th Cir.1986); *Avery v. Secretary of Health and Human Servs.,* 797 F.2d 19, 21 (1st Cir.1986); *MacGregor v. Bowen,* 786

F.2d 1050, 1054 (11th Cir.1986); *Green v. Schweiker,* 749 F.2d 1066, 1070 (3d Cir.1984).

### C. Relative burdens of proof

A "disability" is defined in 42 U.S.C. § 423(d)(1)(A) as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." A disability is found when a claimant is "not only unable to do his previous work but cannot, considering ... his age, education and work experience, engage in any other kind of substantial gainful work which exists in [significant numbers in] the national economy ... either in the region in which such individual lives or in several regions of the country." 42 U.S.C. § 423(d)(2)(A) (1994). "To establish a disability claim, the claimant bears the initial burden of proof to show that he is unable to perform his past relevant work." *Frankl,* 47 F.3d at 937 (citing *Reed v. Sullivan,* 988 F.2d 812, 815 (8th Cir.1993)); *see also Roth v. Shalala,* 45 F.3d 279, 282 (8th Cir.1995) (citing *Locher v. Sullivan,* 968 F.2d 725, 727 (8th Cir.1992)); 20 C.F.R. § 404.1512(c). "If met, the burden of proof then shifts to the Secretary to demonstrate that the claimant retains the physical residual functional capacity (RFC) to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors such as age, education, and work experience." *Frankl,* 47 F.3d at 937 (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982) (en banc). *See also Hajek v. Shalala,* 30 F.3d 89, 92 (8th Cir.1994) (citing *Evans v. Shalala,* 21 F.3d 832, 835 (8th Cir.1994)); *Mitchell v. Shalala,* 25 F.3d 712, 714 (8th Cir.1994).

■ In the sequential evaluation process, where a claimant demonstrates that he does not have the residual functional capacity to perform his past relevant work, the burden shifts to the Secretary "to show that there are other jobs in significant numbers in the economy which [the claimant] can perform consistent with his medically determinable impairments, functional limitations, age, edu-

cation and work experience." *Smith v. Shalala,* 31 F.3d at 717 (citing *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir.1991); 20 C.F.R. §§ 404.1520(f), 416.920(f)). *See also Hajek,* 30 F.3d at 93 (citing *Evans,* 21 F.3d at 835); *Reed v. Sullivan,* 988 F.2d 812, 814 (8th Cir.1993)); *Walker v. Shalala,* 993 F.2d 630, 632 (8th Cir.1993) (citing *Robinson v. Sullivan,* 956 F.2d 836, 841 (8th Cir.1992); *Edwards v. Secretary of Health and Human Servs.,* 809 F.2d 506, 507 (8th Cir.1987); *McCoy v. Schweiker,* 683 F.2d 1138, 1142 (8th Cir.1982)).

The ALJ determined that Norng was able to return to his past relevant work, and, therefore, is not entitled to disability benefits. The issue for the court to decide is whether the ALJ's decision was based on substantial evidence. In an effort to make that determination, the court will review the ALJ's order and the record as a whole.

### 1. The ALJ's analysis of Norng's subjective pain complaints

■ In his decision, the ALJ reviewed the medical evidence in the record, particularly Dr. Strittholt's statement that he did not "feel that there was anything else to offer to Norng" (*Tr. 174*), and Dr. Johnson's statement that "I really feel there is nothing else to do with the chest pain." (*Tr. 177*). The ALJ determined that those statements support a finding that there is no objective medical evidence supporting Norng's disability claims. (*Tr. 23*). The ALJ concluded the following regarding the medical evidence in the record: "Thus, the medical evidence shows no 'objective' basis for the Claimant's present allegations of disabling pain in his chest, lower back, and right shoulder. Likewise, there is no 'objective' basis for his complaints of fatigue and dizziness with postural changes." *Id.* Accordingly, the ALJ completed the first part of his disability analysis—the review of the objective medical evidence—by concluding that Norng is not medically disabled.

The court is aware, based on the foregoing, that its analysis of the ALJ's evaluation of the objective medical evidence is limited. Accordingly, it cannot dispute the fact that the medical evidence, standing alone, may

not support Norng's claim of disability. Nonetheless, under *Hinchey*, 29 F.3d at 432, this is only half the analysis. The ALJ must also evaluate the subjective testimony of Norng and his witnesses before deciding on whether Norng is, in fact, disabled. *Ricketts v. Secretary of Health and Human Servs.,* 902 F.2d 661, 664 (8th Cir.1990) (citing *Smith v. Heckler,* 735 F.2d 312, 317 (8th Cir.1984) in turn citing *Basinger v. Heckler,* 725 F.2d 1166, 1169–70 (8th Cir.1984) ("a failure to make credibility determinations concerning [the subjective testimony of the family and others] requires a reversal and remand")). In this case, the ALJ found that Norng and his witnesses were not credible and, therefore, ruled that Norng is not disabled. (*Tr. 23–25* ). The court will, therefore, review the ALJ's decision and the record to determine whether the ALJ's credibility determinations were supported by substantial evidence as a whole.

### a. *Alleged inconsistencies regarding cooking and shopping*

In his decision, the ALJ discounted Norng's subjective pain complaints by focussing on Norng's testimony. Specifically, the ALJ found an inconsistency in Norng's testimony regarding the issue of cooking. The ALJ wrote that "(t)he Claimant stated that he does 'nothing' during the day. He said he does no housework and only 'a little' cooking. He said he cooks barbecue dishes and sour sauce and that his wife cooks when he doesn't do so. He then said he does some cleaning of the house but that his children do the laundry. He also does the grocery shopping." (*Tr. 19* ).

Based on that information, the ALJ determined that Norng's testimony was not credi-

ble. He stated that "In Exhibit 6/4 [Norng] answered a question concerning his activities involving household maintenance such as cooking, cleaning, and other odd jobs by stating that he 'can't do any of these'. Although he acknowledges no improvement in his condition since he completed that form in December of 1992, he testified that he is now able to do some cooking and shopping." (*Tr. 23* ).

Norng objects that his testimony created any sort of inconsistency in the record, and maintains that the statements regarding his ability or inability to do housework should not have formed the basis for the ALJ's credibility determination. He points out that Kan, the son-in-law, clarified this point by stating that Norng can only do short-term shopping due to his back problems. Norng also points out that the ALJ was not paying attention to Kan's testimony when he made those statements about shopping.[15] As is indicated more fully in footnote 15, the ALJ said that despite the fact that he was not paying "any attention at all" when Kan spoke about Norng's shopping, he would not disregard that testimony. Norng suggests, however, that this is precisely what happened.

The Secretary defends the ALJ's finding of an inconsistency in the testimony, stating that an individual's subjective complaints must be evaluated in light of the evidence that may be inconsistent with the claimant's testimony. For support, she cites *inter alia, McClees v. Shalala,* 2 F.3d 301 (8th Cir. 1993). In *McClees*, the Eighth Circuit found inconsistencies between the claimant's subjective pain complaints and the medical evidence, then found other inconsistencies be-

---

**15.** The testimony at that point in the hearing was as follows:

Q. When, when you go to High Vee [sic] with him is it to go shopping for the, for the week or, or are they big shopping trips, or—

A. Oh no, you know the big, something like Saturday, Sunday, there are a lot of people, he cannot walk too long, we just get out in the morning and it's not too many people, just buy a little bit, and just go down to like the express lane or something like that. Just pay for and go home.

ATTY: I understand that, did the court?

ALJ: I'm sorry, I—

ATTY: I said I understand that, I don't know if the court did.

ALJ: Well the court was busy doing something else.

ATTY: Oh, okay.

ALJ: So the court wasn't paying any attention. But the court, the court will review what he says through the notes and also the tape.

ATTY: Okay. If I understand him correctly—

ALJ: It's not that I'm going to disregard the testimony, that's not my response.

ATTY: Okay.

*(Tr. 79).*

tween his allegations of pain and his testimony. The court stated that:

The ALJ also noted the *significant difference* between the appellant's account of his daily activities given at the first hearing in 1987, and the recitation given at the hearing in 1990. In 1987, appellant testified that in 1979 he could walk two blocks to a coffee shop, drink coffee for 10 or 15 minutes, then walk home. He also stated that he did the cooking, housework, and laundry in about 10 to 15 minute increments. He stated that he could stand for up to two hours and sit for an hour at a time. In 1990, the appellant testified that he was limited to fixing breakfast and occasionally helping with dinner, driving his wife to and from work, reading, watching television, and lying down. He stated that he could stand for no more than an hour, and sit for no more than 30 minutes. We conclude that the ALJ's decision to discredit McClees's subjective complaints of pain and functional restrictions under *Polaski* is supported by substantial evidence.

*McClees*, 2 F.3d at 303 (*emphasis added*). The Secretary also cites *Walker v. Shalala*, 993 F.2d 630 (8th Cir.1993) as supporting her contention that Norng's testimony amounted to an inconsistency appropriately weighing against the credibility of his subjective pain testimony. In *Walker*, the Eighth Circuit determined that the claimant's subjective pain testimony was inconsistent with his daily activities because those activities represented the "full range of light work" under the appropriate Social Security regulations. *Walker*, 993 F.2d at 632.

As well, the Secretary cites *Dodd v. Sullivan*, 963 F.2d 171 (8th Cir.1992) (per curiam) for support. In *Dodd*, the claimant on appeal attempted to argue that the ALJ erroneously concluded that he had the ability to perform the full range of medium work under the regulations. *Dodd*, 963 F.2d at 172. The Eighth Circuit determined that the ALJ's decision was supported by substantial evidence in the record due, in large part, to the fact that claimant Dodd "appeared to be financially motivated to qualify for disability benefits, did not seek frequent medical help or use assistive devices and that there was no

evidence in the record that he told his doctors that his medication made him drowsy." *Id.* Regarding the specific issue of the claimant's daily activities, the Eighth Circuit found that in addition to the above-mentioned facts, claimant had also attempted to assert that "his nonexertional impairments harm his ability to stand, walk, squat, bend and lift," yet his testimony showed that he was able to shop, fish and fix bicycles. *Id.*

Finally, the Secretary cites *Nelson v. Sullivan*, 946 F.2d 1314 (8th Cir.1991) as supporting the ALJ's finding of an inconsistency in Norng's testimony. *Nelson*, a case which the Eighth Circuit acknowledged was a "close" one, *Nelson*, 946 F.2d at 1315, involved a claimant who had been receiving disability benefits, but whose condition had improved after surgery to the point where the ALJ had determined he was no longer eligible for those benefits. *Nelson*, 946 F.2d at 1316–17. In that case, the Eighth Circuit found in the Secretary's favor after noting that one of the claimant's physicians remarked that after treatment claimant Nelson stated that his pain was "completely alleviated," *Nelson*, 946 F.2d at 1316, that Nelson was only visiting his physician once a year, that his physician did not prescribe any medication stronger than aspirin and that "(t)hese factors, combined with claimant's moderate daily schedule of activities, suggest an inability to engage in some sort of light work." *Nelson*, 946 F.2d at 1317. However, the court did not specify what that daily schedule of activities consisted of.

■ Based on the foregoing case law, the court does not find that Norng's subjective pain testimony was discredited by any inconsistencies in the record regarding his ability to cook and shop. Initially, the court notes that a "disability" under the Social Security Act does not mean total disability or exclusion from all forms of human and social activity. *Harris v. Secretary of the Dep't of Health and Human Servs.*, 959 F.2d 723, 726 (8th Cir.1992) (claimant's ability to cook, shop, clean, do laundry and visit friends does not constitute substantial evidence that claimant can engage in substantial activity). "(A) claimant need not prove that he or she is bedridden or completely helpless to be

found disabled." *Payton v. Shalala,* 25 F.3d 684, 687 n. 6 (8th Cir.1994) (citing *Thomas v. Sullivan,* 876 F.2d 666, 669 (8th Cir.1989)). "In order to find that a claimant has the residual functional capacity to perform a certain type of work, the claimant must have the ability to perform the requisite acts day in and day out, in the sometimes competitive and stressful conditions in which people work in the real world." *Id.* (citing *McCoy v. Schweiker,* 683 F.2d 1138, 1147 (8th Cir.1982) (en banc)). "The ability to prepare meals for dependents, occasionally visit with friends, watch TV, and read does not qualify as the ability to do substantial gainful activity ... and cannot reasonably be characterized as 'a great deal of physical activity.'" *Id.* (citing *Thomas,* 876 F.2d at 669).

If the ALJ had determined that Norng is not disabled based on his testimony regarding cooking and shopping, the court would be inclined to find in Norng's favor. However, the ALJ used Norng's testimony about cooking and shopping to demonstrate an apparent inconsistency. Specifically, he pointed to what he referred to as Exhibit 6/4 [16] in which Norng was asked on the fourth page to "describe your daily activities in the following areas [including cooking, cleaning, shopping and odd jobs around the house] and how much you do of each and how often you do it." *(Tr. 114).* In that category, Norng stated that he "can't do any of these." *Id.* Since Norng testified at the hearing that he cooks "a little bit" *(Tr. 61)*—barbecuing or making sour sauce—that he goes grocery shopping *(Tr. 62)*, and that he cleans the house *(Tr. 61)*, the ALJ asserted that Norng had lied and that all of his pain testimony was tainted by this inconsistency.

I disagree. First, it is undisputed that Norng speaks no English and that all of the forms which he signed were filled out by "interpreters" who were actually Norng's friends. Norng's friends may have the ability to write in English on a limited basis, but they may not be fluent in the language. It is very likely that the significance of the questions in the disability determination form and

the accuracy of the answers written on that and other forms was lost in the translation.

Second, the statement that "I can't" cook is not necessarily inconsistent with applying barbecue sauce to meat and baking it in an oven, or combining a few spices and making a sauce to be applied to meat or vegetables. It may well be that Norng's concept of "cooking" involves creating an entire meal with a variety of foods (*e.g.* rice, meat, poultry, fish, vegetables) at several temperatures for a number of different time periods, with bending and lifting of pots and pans, then combining the cooked items to create something edible. If that is the case, then it is not beyond comprehension that Norng is, or believes that he is, unable to cook.

Accordingly, this case is distinguishable from *McClees* because there is no "substantial difference" between Norng's answers on the disability determination form and his testimony at the ALJ hearing. Likewise, it is distinguishable from *Walker* because there is no evidence in the record which demonstrates that Norng's condition meets the full range of any type of exertional level under the applicable guidelines based on his ability to cook barbecued dishes and make sour sauce, or to do a small amount of shopping, and the ALJ does not assert that it does. I acknowledge that *Dodd* is a closer case, but I believe that *Dodd* is not persuasive because shopping and cooking relatively simple meals which do not require a significant amount of bending or stretching do not require the same physical exertion as fishing and fixing bicycles. Finally, *Nelson* is not dispositive because in that case the Eighth Circuit did not describe the claimant's "moderate" activities, and, in any event, it considered *Dodd* to be a "close" case in which the claimant had at one time been disabled, but had undergone therapy which had improved his condition. In the present case, Norng underwent treatment, but never showed signs of marked improvement.

As stated above, the ALJ had a duty to fully and fairly develop the record. *See Battles,* 36 F.3d at 44. The record shows that the ALJ did not ask Norng to explain what

---

**16.** The court believes that the ALJ misidentified the exhibit and that it is actually Exhibit 6/8, a Disability Report beginning at page 111 of the Transcript.

he meant when he had his interpreter write on the disability determination form that he couldn't cook. If the ALJ felt this was a significant enough inconsistency to void the plaintiff's subjective complaints, then he had a duty under *Battles* to inquire at the hearing about it, or to notify the parties and to have them supplement the record on this issue. He failed to do so. Similarly, although he used Norng's shopping against him, the ALJ did not stress the point at the hearing and did not ask for supplementation on that point, either. In fact, he admitted that he was not paying "any attention" at all. (*Tr. 79*).

The ALJ violated his duty under *Battles* to develop the record, and he should not have based his credibility analysis on the alleged "inconsistency" between Norng's answers on the disability determination form and his answers to the ALJ's questions without further exploring the meaning of those statements. Based on the record as it stands, the court is of the opinion that Norng's statements regarding cooking and shopping may not be inconsistent. To the extent that the ALJ found against Norng on that basis, then, the court is persuaded that the ALJ's determination was not supported by substantial evidence in the record as a whole.

### b. Alleged discrepancies regarding Norng's motivation to work

The ALJ pointed to another apparent inconsistency in the record regarding Norng's motivation to receive disability benefits. The ALJ pointed to Dr. Johnson's January 1, 1993 notation that "(p)atient's interpreter did talk about the disability and how he needs to be on permanent disability and the fact that his wife can't work" (*Tr. 175*) and with this statement he concluded that Norng is not disabled, but is, instead, concerned only with caring for his wife. (*Tr. 24*). The ALJ also noted that during the administrative hearing, Norng acknowledged that he has a dual motivation for staying home—his pain and his need to take care of his wife. (*Tr. 65*). Specifically, the testimony was as follows:

Q. Is the reason you're not working, is it because you're caring for your wife as opposed to having pain?

A. It's both.

Q. If you were, if you didn't have any pain would you still be staying home taking care of your wife?

A. If I was not sick I would not stay and watch.

Q. Who would watch your wife?

A. I would watch her but it would have it's own time.

Q. Who would watch her in the daytime when you were at work and your children were at school?

A. I think there's not going to be anybody to watch her.

(*Tr. 65*).

In response to the ALJ's finding that Norng's motivation to care for his wife nullified his disability claim, Norng argues that "the testimony of the Claimant was premised on the fact that if he were able to go to work, who would take care of his wife, and thus, contained an inaccurate hypothetical question to the Claimant, due to the fact that he is, in fact, unable to work, due to his disabilities and not the limitations of his wife. (R. 65)." (*Pl. br. at 8*).

It is true that the financial motivation to not work or to be considered disabled is a factor considered by district courts in the Eighth Circuit when dealing with Social Security appeals. *Ownbey v. Shalala*, 5 F.3d 342, 345 (8th Cir.1993) (per curiam); *see also Dodd*, 963 F.2d at 172. Nonetheless, it is but one factor which is considered. In *Ownbey*, for example, the Eighth Circuit found that "[the claimant's] past work history does indicate a lack of financial motivation to return to work," *Ownbey*, 5 F.3d at 345, but the court based its disability analysis on that *plus* the fact that the claimant

did not seek or receive treatment for his alleged pain in his back, neck, and head; numbness in his hands; and dizziness; and drowsiness from medication. Ownbey sought treatment only for the pain in his right ankle. Moreover, Ownbey's testimony conflicted with Dr. Thorn's observation. Ownbey testified that he could sit for only five minutes, could lift and carry only five pounds, and could stand for only one hour.

Dr. Thorn instead observed Ownbey could sit without any restrictions, could lift thirty pounds, and stand for two hours. *Ownbey,* 5 F.3d at 344–45. In Norng's case, his work history does not suggest malingering, and none of the above additional factors are present. Norng has regularly consulted physicians about his pain, has not excluded from the ALJ any of the pain he described to his physicians and has testified in accordance with the reports of the physicians.

In *Dodd,* the district court affirmed the Secretary's denial of benefits where the Secretary's denial was based, in part, on the fact that the claimant "appeared to be financially motivated to qualify for disability benefits." *Dodd,* 963 F.2d at 172. However, the denial was also based on the additional factors, expressed as follows: "[the claimant] was able to perform normal daily activities ... did not seek frequent medical help or use assistive devices, and there was no evidence in the records that he told his doctors that his medication made him drowsy." *Id.* The Eighth Circuit also noted that "Dodd only recently began seeing a doctor regularly, exhibited normal movement in his back, and did not use a back brace." *Id.* Further, as already mentioned, the Eighth Circuit also considered the fact that the claimant's "daily activities, such as shopping, fishing, and fixing a bicycle [were] evidence of his ability to perform medium range work." *Id.* For reasons already stated, Norng's situation is distinguishable from that of the *Dodd* claimant.

It does appear, as Norng asserted, that the ALJ was fishing for a response which would suggest that Norng's true motivation for claiming a disability was not his pain, but instead his desire to stay at home with his wife. However, read in context as set out above, Norng's response to the ALJ's questions clearly demonstrated that *if* he felt that he was able to work he *would* do so, thereby leaving his wife at home alone. (*Tr. 65* ). Also, Norng never stated that his *primary* or *sole* motivation for claiming a disability was his desire to take care of his wife. Instead, he stated that his reason for not working was "*both*" (*Tr. 65* ) because of his pain *and* because he was caring for his wife. *Id.* With

respect to the statement he made to Dr. Johnson ("(p)atient's interpreter did talk about the disability and how he needs to be on permanent disability and the fact that his wife can't work" (*Tr. 175* )), this sentence, taken from Dr. Johnson's notes, is in the conjunctive: he needs to be on permanent disability *and* his wife can't work. While it may suggest that Norng wanted the doctor to declare that he was disabled so that he could collect money with his wife out of work, it also suggests that he was in great pain but still needed to watch out for his wife. Here again, the statement does not demonstrate that Norng is not experiencing great pain, nor that the wife's care is Norng's primary motivation for claiming a disability.

As well, that statement was made on January 7, 1993, a mere two months after the November 4, 1992 automobile accident. It is possible that Norng was having problems collecting insurance proceeds from his accident at that time and that he was *briefly* financially motivated by a desire to be found disabled. Dr. Johnson's notes do not indicate that the subject ever came up after that, nor does anything else in the record, save for Norng's responses to the ALJ's questions. If the ALJ thought that Dr. Johnson's notes pertaining to Norng's disability claim were significant enough to destroy Norng's credibility, then the ALJ had a duty under *Battles* to more fully and fairly develop the record. In other words, the ALJ should have asked Norng at the hearing to explain those remarks. For all of the foregoing reasons, the court is persuaded that the ALJ erred in discrediting Norng's subjective pain complaints based on an alleged financial motivation to not work.

### c. Alleged inconsistencies regarding Norng's pain on December 1, 1992 and his pain on May 20, 1993

In his decision, the ALJ stated the following:

On December 1, 1992, when the Claimant filed his application for disability benefits, he was noted to have pain when he stood up or sat down. (Exhibit 6/8) [17] However,

---

**17.** The appropriate portion of the exhibit is found at transcript page 118.

on May 20, 1993, when he filed a report in conjunction with his request for reconsideration, a Social Security claims representative recorded that there was "no observable pain" during his interaction with the Claimant. (Exhibit 7/5) [18] (*Tr. 21* ). The claims representative's statement was in response to a mandate on the application form which read, "(d)escribe fully: General appearance, behavior, any unusual observed difficulties not noted elsewhere, any unusual circumstances surrounding the interviews." (*Tr. 129* ). The representative's full answer was as follows: "No observable pain. Claimant reached around to his back pocket in searching for a piece of paper—did not appear painful (no change in facial expression)." *Id.*

Norng objects to the ALJ's discounting of his subjective pain complaints on the basis of the claims representative's report when weighed against Norng's original disability application. "Who this person is and how long they saw the Claimant is not clear from the record," Norng argues. (*Pl. br. at 9* ). "Furthermore, the fact that a Social Security clerical worker could not observe pain due to no change in facial expression is not substantial evidence that Claimant does not have and experience difficulties with pain." *Id.* The Secretary did not respond to this argument, but I am assuming that her response would be subsumed in her arguments pertaining to other alleged inconsistencies in the record.

For reasons already stated twice before, I believe that if the ALJ felt the two reports were conflicting, he had a duty under *Battles* to attempt to resolve the conflict. He breached that duty by not bringing the matter to Norng's attention at the hearing, and not giving him the opportunity to explain it. Further, I hesitate to give credence to the observations of a Social Security claims representative, since those observations are not medical opinions and are probably not objective. Therefore, the ALJ erred in relying on the claims representative's observations as a basis for finding that Norng's subjective pain complaints were not credible.

### d. Alleged inconsistencies regarding Norng's pain on November 3, 1992 and his pain on November 10, 1993

On page five of his decision, the ALJ stated the following:

On October 29, 1992 and again on November 3, 1992, the day before the Claimant's automobile accident, he received physical therapy after complaining of pain in his right elbow. (Exh 13/4) [19] However, when he was admitted following the collision, he reported only pain in the left side of his chest along with a headache and "a little" neck pain. He reported no pain in his right arm or any other extremity. Shortly before his discharge from the hospital, he complained of "some visual changes." (Exhibit 14) [20]

(*Tr. 21* ). Norng asserts that this alleged inconsistency in the record is unreliable because of the language barrier between he and his treating physicians. I agree. The November 29, 1992 progress notes from Marian Health Center stated that "Pt. uses an interpreter who is very difficult to understand and did not always understand questions asked in English." (*Tr. 146* ). Similarly, Dr. Johnson stated in his November 10, 1992 report that "(s)ince he does not speak English, it was difficult to get the patient the pain medication that he needed." (*Tr. 149* ). Even if the language barrier was not a problem, however, this evidence is still not reliable because of the significant change in circumstances between Norng's physical condition before and after the automobile accident. Given the muscle aches and chest and back pain which resulted from the accident, combined with the pain medication he was taking at the time (Tylenol # 3), it may well be that the elbow pain he had previously experienced was exceeded by the pain he felt from the accident. Therefore, the ALJ erred in using the above-mentioned alleged inconsistencies in his credibility analysis.

### 2. The credibility of Norng's son-in-law

In addition to finding that Norng was not credible, the ALJ also found Norng's son-in-

---

**18.** The appropriate portion of that exhibit is found at transcript page 129.

**19.** That exhibit is found at transcript page 146.

**20.** That exhibit is found at transcript page 149.

law, Choeun Kan, not credible. The ALJ determined that Kan was not credible because, when Kan pointed to portions of *his* body in order to demonstrate those portions of *Norng's* body which radiated pain, he confused the right side with the left. The testimony went as follows:

EXAMINATION OF WITNESS BY ATTORNEY:

Q. Has your father-in-law told you what his complaints are regarding pain?

A. He just told me like he hurt on the, the rib, said I hurt on the rib, I cannot sit down, and just hurt on the back, and other hand, it's low down, and—

Q. Okay, you're pointing to demonstrate, pointing to your rib area and you're pointing to your right shoulder area?

A. Yeah, and on the back.

ALJ. Did he point to the right shoulder area, I didn't notice.

A. No, it was this.

RE–EXAMINATION OF WITNESS BY ADMINISTRATIVE LAW JUDGE:

Q. Okay, I'm sorry, I, I wasn't watching and I didn't see him do that so I just, I heard back and I heard ribs but I didn't hear right shoulder. Right shoulder he told you about also, did he tell you that his right shoulder hurt him too[?]

A. Yeah just, just go up like this (INAUDIBLE), and go up like that and go on the side.

Q. You mean his right ribs and his right shoulder?

A. Yeah.

Q. And his back?

A. Yeah.

Q. Okay.

(*Tr. 74–5*). Accordingly, the ALJ stated that Kan was not credible because he "testified that the Claimant had told him that the right side of his chest hurt [when] all of the other evidence in this case shows that it was the left side of the Claimant's chest which caused him pain." (*Tr. 24*). The Secretary defends the ALJ's determination that Kan was not credible on the basis that "the ALJ is required to consider such inconsistencies in determining the credibility of a witness." (*Def. br. at 11*).

The court does not dispute that the Secretary is permitted to discount the credibility of witnesses in a disability determination. *Rappoport v. Sullivan,* 942 F.2d 1320, 1322–23 (8th Cir.1991). However, the ALJ was wrong. *All* of the other evidence in this case *did not* show that Norng's pain was limited to his left side. It is true that the October 29, 1992 progress notes from Marian—notes from a date *preceding* the automobile accident—indicated that "(w)hen asked where pain is located pt. pointed to Left (UNREADABLE) and states pain started there." (*Tr. 146*). It is also true that during his recuperation period at Marian *immediately following* the accident, he "did have left-sided chest pain as his major discomfort" (*Tr. 148*), and continued "to complain of the left-sided chest pain." (*Tr. 149*).

Nonetheless, the evidence shows that *after* the accident, and after Norng was released from Marian, the pain was *not* limited to Norng's left side. Dr. Strittholt's notes from August 19, 1993 reveal that Norng described his pain as "primarily . . . in the mid portion of his lumbar spin although [he] describes pain *throughout the entire body.*" (*Tr. 173*). Further, Dr. Strittholt's examination revealed that Norng's "back exam shows him to have areas of tenderness diffusely *throughout the entire low back region.* This seems to be worse right over the *central portion* of the mid lumbar." *Id.*

Similarly, Dr. Strittholt's August 26, 1993 notes revealed that "(b)y history, he continues to have pain *primarily on the right side* at his lumbosacral spine area and some also up into the lumbar area." (*Tr. 174*). As well, Dr. Johnson's progress notes from November 17, 1992 (shortly after the accident) discussed "lots of left chest pain." (*Tr. 175*) but went on to describe chest and rib pain *generally* without differentiating between right and left. *Id.* This may have been due to the fact that on March 30, 1993, a bone scan revealed "(m)ultiple small localized areas of abnormal increased uptake to the *right* ribs" which was "most likely due to fractures in the healing process." (*Tr. 169*).

Under *Perales,* this court's review of the ALJ's conclusions is limited. "If both parties met their burdens and the decision of the ALJ is rationally based upon the substantial evidence cited in support thereof, then [this court] must give conclusive effect to the ALJ. [I am] not permitted to substitute [my] opinion for that of the ALJ, even if [I] might have reached a different result on the basis of the evidence." *Gillyard v. Shalala,* No. 93–0065, 1994 WL 52756, at *2, 1994 U.S.Dist.LEXIS 1802, at *5 (E.D.Pa.1994).

The court is cognizant of its limited scope of review, but notes that the ALJ's language in discrediting Kan was quite strong. The ALJ stated that Kan's testimony contradicted "all of the other evidence in this case." (*Tr. 24* ). In fact, that was not the situation. There was quite a bit of evidence indicating that Norng experienced pain throughout his ribs and chest. Therefore, the court is persuaded that the ALJ erred in discounting Kan's testimony to the effect that Norng experienced pain on his right side.

The ALJ also discounted Kan's testimony based on the following exchange between he and Kan:

Q. When's the last time you took [Norng] to the doctor?

A. I don't know when, I've forgotten.

Q. How long ago?

A. About a month.

Q. Who did you take him to a month ago?

A. Chiropractic and just go down and do exercise and do therapy and—

Q. He goes to therapy does he?

A. Yeah.

Q. He told us he hasn't seen a doctor since September, or since last fall?

A. September?

Q. Since last fall. You couldn't have taken him a month ago if he's telling me correctly. He says he hasn't seen the chiropractor in a long time, and he hasn't seen Dr. Johnson since last fall. How could you have taken him somewhere last month?

A. (INAUDIBLE), just talk to him before, just talked to them and he's not go but—

Q. I'm sorry, what did you tell me?

A. Say I might confuse there, like I just talk to them and just not go over there.

Q. You didn't take him to the doctor a month ago then, did you?

A. Yeah, yeah.

ALJ: Any further questions, sir?

ATTY: You said he went to therapy, where, where'd he go, who did therapy for him?

CLMT: I don't know, I forgot at that time.

ATTY: Was the chiropractor doing therapy or a doctor, other doctor doing some therapy?

CLMT: Say even to therapy in Marine Hill, and at a doctor in (INAUDIBLE), say Wallach, Dr. Wallach.

ALJ: But he went to therapy in '92, 1992 he was in therapy for his right arm. He saw Dr. Striteholt [*sic* ], I don't know if he arranged for therapy for him. I have no therapeutic reports outside of '92. Do you have any?

ATTY: No I don't, that's why I was—do you remember when he went to therapy?

CLMT: Oh you want to know when, right?

ATTY: Was it recent or was it more than a year ago?

RE–EXAMINATION OF WITNESS BY ADMINISTRATIVE LAW JUDGE:

Q. Or don't you know?

A. I think that therapy at Dr. Paul Johnson just, just send him down and just do therapy and—

Q. How long, for how long did he go to therapy?

A. For a long time.

Q. How long is a long time?

A. Say the first time on, on '92, and just go down therapy and (INAUDIBLE) and I don't know what doctor and—

Q. That was for his arm, therapy for his arm?

A. Yeah.

Q. Did he go for therapy for his back, or did he go to a chiropractor for his back?

A. He's got some chiropractic for his back too but (INAUDIBLE).

Q. That was for the chiropractor for his back?

A. Yeah.

Q. Did he go to therapy for his back in addition to the chiropractor, did you take him?

A. Yeah.

Q. Where did you take him in '93?

A. See a doctor in Sioux City, and Douglas Street, Dr. Wallach I think he tried.

ALJ: I don't know who he's referring to.

ATTY: When is the last time you took him to therapy for his back?

WTN: I forgot it.

(*Tr. 80–2*). From this exchange, the ALJ concluded:

As noted above, [Kan] testified that he had taken the Claimant to the doctor's office within the month before the hearing in January of 1994. When advised that the Claimant had testified that he had not been to the doctor since the preceding fall, he suggested that he had taken him to the chiropractor. After being advised that the Claimant had denied seeing the chiropractor lately, he proposed that it must have been the physical therapist he had taken the Claimant to see. Again, when he learned that the Claimant had not received therapy in that time period, he relented and said that he must not be remembering the facts correctly.

\*　　\*　　\*　　\*　　\*　　\*

While it is not unusual for one to want to assist his father-in-law in his efforts to receive disability benefits out of affection and concern, Mr. Kan's testimony at the hearing demonstrated that he was letting the desire to help the Claimant interfere with his obligation to provide truthful testimony.

(*Tr. 24–25*).

The court believes that Kan's inability to recall dates does weigh against his credibility in this matter. Nonetheless, Kan stated at the outset that he did not remember precisely when he took Norng to the various examining physicians. The court is reluctant, therefore, to concur with the ALJ's suggestion that Kan lied, then tried to make up for it. If anything, Kan appeared to attempt to provide the ALJ with an accurate chronology of events, even though he had already admitted that he was unsure of the exact times and dates during which he took Norng to see his doctors. In the court's view, this was an attempt by the ALJ to create a situation in which the witness would appear not credible when, in fact, his answers were consistent all along: he could not recall with any degree of accuracy when he brought Norng to his doctors' offices.

The reliability of Kan's testimony is damaged, somewhat, because he was brought as a witness to articulate facts regarding Norng's physical condition. To the extent that Kan could not accurately articulate facts about Norng's office visits, therefore, his testimony is not without fault. However, the court is not persuaded that an inability to remember dates would affect Kan's ability to articulate what he observed in terms of Norng's pain and Norng's ability to perform every day activities. I find that Kan's testimony about those activities is consistent with Norng's testimony, as well as the medical evidence regarding persistent back and neck pain. Therefore, the ALJ erred when he ruled that Kan's testimony, as a whole, was not credible.

**3. The ALJ's "sit and squirm" analysis**

■ In concluding that Norng was not credible, the ALJ made the following observation:

It should be noted that, despite the allegations of pain at the hearing and the allegation of inability to sit for even 30 minutes,

the Claimant sat for longer than 30 minutes at the hearing and showed no signs of being in pain or any inability to concentrate on the proceedings. In addition, he was observed during the hearing to reach over and bend his back to obtain a facial tissue which was located on a table over 3 and ½ feet from him. He was able to do this without any apparent hesitancy or observable difficulty. Further, he was able to sit through his wife's 3–hour hearing the previous day before the undersigned Administrative Law Judge with no apparent difficulty.

*(Tr. 24)*. Norng objects to the ALJ's use of his personal observations at the hearing as evidence of Norng's lack of credibility. He urges the court, therefore, to find reversible error. For support, he cites, *inter alia*, *Perminter v. Heckler*, 765 F.2d 870 (9th Cir. 1985). In *Perminter*, the Ninth Circuit Court of Appeals stated that "(t)he ALJ's reliance on his personal observations of Perminter at the hearing has been condemned as 'sit and squirm' jurisprudence." *Perminter*, 765 F.2d at 872 (citing *Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir.1982)). However, *Perminter* is not entirely helpful to Norng because the Ninth Circuit standard, at least at that time, was that "(i)n order for pain to be disabling, subjective complaints must be accompanied by medical evidence." *Taylor v. Heckler*, 765 F.2d 872, 876 (9th Cir.1985) (citing *Sorenson v. Weinberger*, 514 F.2d 1112, 1118 (9th Cir.1975)).[21] Accordingly, the *Perminter* court ruled that a "(d)enial of benefits cannot be based on the ALJ's observation of Perminter, when Perminter's statements to the contrary, as here, are supported by objective evidence." *Perminter*, 765 F.2d at 872.

Norng also cites *Lewis v. Weinberger*, 541 F.2d 417 (4th Cir.1976) as supporting his thesis that applying the "sit and squirm" analysis was reversible error. In *Lewis*, the Fourth Circuit Court of Appeals observed:

The Secretary also attempts to rely on the Administrative Law Judge's observation that Lewis did not appear to be in pain while testifying. In cases of alleged psychological disability, such lay observation is entitled to little or no weight and, standing alone, cannot be substantial evidence to support the Secretary's decision.

*Lewis*, 541 F.2d at 421. *Lewis* involved a claimant with a psychological disability, and is distinguishable for that reason alone, since Norng is asserting physical disabilities. It is also not dispositive regarding reversible error, however, because the Fourth Circuit reversed the Secretary's decision not because of the "sit and squirm" observations, alone, but instead on "the record before us, [specifically] the overwhelming evidence [showing] that Lewis is totally disabled." *Id.*

Norng also cited an Eighth Circuit case, *Smith v. Heckler*, 735 F.2d 312 (8th Cir.1984) as supporting a finding that the ALJ's credibility determination, based on his personal observations at the hearing (and, presumably, at the wife's earlier hearing) constituted reversible error. In *Smith*, as in *Lewis* and *Perminter*, the circuit court determined that the "sit and squirm" analysis was one of *several* errors made by the ALJ, and that the case required a reversal based on all of the errors. *Smith*, 735 F.2d at 319. Therefore, the fact that the ALJ used a "sit and squirm" analysis does not, by itself, support a reversal in this circuit.

■ Nonetheless, *Smith* pointed out that in the Eighth Circuit, "(w)hile the ALJ may disbelieve a claimant's subjective complaints of pain because of inherent inconsistencies or other circumstances, the ALJ is not free to reject such complaints solely on the basis of personal observations made during the hearing." *Id.* (citing *Reinhart v. Secretary, Health & Human Serv.*, 733 F.2d 571, 573 (8th Cir.1984)). Further, while an ALJ is permitted to take notice of the claimant's *demeanor* during an administrative hearing, "the ALJ is not free to reject a claimant's credibility on account of the claimant's failure to sit and squirm during the hearing." *Cline v. Sullivan*, 939 F.2d 560, 568 (8th Cir.1991)

---

21. This is a more stringent standard than the Eighth Circuit's. As stated above, in the Eighth Circuit, even where the objective medical evidence does not show disability, an ALJ must do a separate analysis of a claimant's subjective pain complaints before ruling that the claimant is not disabled. *Polaski*, 739 F.2d, at 1321–22.

(citing *Reinhart*, 733 F.2d at 573). The ALJ's "observation of claimant's ability to remain alert despite personal discomfort is [not] contradictory to claimant's allegations of disabling pain [nor] evidence of a substantial nature in support of a finding discrediting appellant's credibility." *Id.*

The Secretary contends that the ALJ was referring to Norng's demeanor when he made the observations about Norng's ability to sit for more than 30 minutes and reach across a table for a tissue without any visible signs of pain. "Demeanor" is defined as relating to a witness's "physical appearance, outward bearing or behavior." BLACK'S LAW DICTIONARY 430 (6TH ED.1990) (citation omitted). "It embraces such facts as the tone of voice in which a witness' statement is made, the hesitation or readiness with which his answers are given, the look of the witness, his carriage, his evidences of surprise, his gestures, his zeal, his bearing, his expression, his yawns, the use of his eyes, his furtive or meaning glances, or his shrugs, the pitch of his voice, his self-possession or embarrassment, his air of candor or seeming levity." *Id.* (citation omitted). This court has reviewed the testimony and believes that the ALJ looked beyond Norng's demeanor and was, in fact, applying a "sit and squirm" test.

Based on the foregoing, the ALJ inappropriately relied on Norng's ability to reach across a table to get a facial tissue and sit through his own hearing, as well as his wife's ALJ hearing the day before, in evaluating Norng's credibility. As Norng argues, "the ALJ erred in stating ... that the Claimant was able to stand up, bend over slightly to lift up a tissue off the counsel table, *(R. 24)*, [and that this] somehow shows that he's able to bend over and work at a meat packing plant...." *(Pl. br. at 13)*. It is not, under Eighth Circuit precedent, substantial evidence and is not dispositive on the issue of Norng's pain or the lack thereof. *Cline*, 939 F.2d at 568. However, based on the foregoing, it is also not reversible error.

### 4. The hypothetical questions
#### a. Vocational analysis required

"When evaluating whether a claimant is able to return to his past work, the ALJ is required to follow the appropriate guidelines. If we cannot make a decision based on your current work activity or on medical facts alone, and you have a severe impairment(s), we then review your residual functional capacity and the physical and mental demands of the work you have done in the past. If you can still do this kind of work, we will find that you are not disabled."

*Groeper v. Sullivan*, 932 F.2d 1234, 1238 (8th Cir.1991) (quoting 20 C.F.R. §§ 404.1520(e); 20 C.F.R. §§ 416.920(e)).

In Norng's case, the ALJ did a residual functional analysis by consulting with vocational expert Trudeau. The Secretary argues that Trudeau's testimony was not required—and need not be considered here— "(b)ecause plaintiff did not fulfill his burden of making a *prima facie* showing that he could not return to his past relevant work ..." *(Def. br. at 12)*. Norng's testimony, Kan's testimony and the medical reports submitted by his treating physicians clearly show that Norng is not working, has not been working for two years and has been in pain since the November 1992 automobile accident. For reasons stated above, the court is persuaded that the ALJ improperly discounted Norng's subjective pain testimony by using inappropriate credibility criteria. Therefore, the result reached by the ALJ— finding Norng not disabled—was flawed. It is improper, therefore, for the Secretary to conclude, based on the ALJ's flawed analysis and result, that Norng failed to establish a *prima facie* case of disability. For that reason, the ALJ *was* required to perform a vocational analysis of Norng's physical conditions. The court will accordingly review the vocational expert's testimony to determine whether the ALJ erred in relying on it.

In his decision, the ALJ determined:

Ms. Sandra Trudeau, the vocational expert, testified that, based upon his testimony and descriptions contained in the file, and based on the functional limitations described above, the Claimant would be unable to return to his past relevant work as a farmer. She testified that he would be able to return to his past relevant work as

**1222**

a meat trimmer. She stated that she has personal knowledge about how his job is performed and repeated her opinion that the Claimant would be able to again perform in that occupation, even with the functional limitations stated above. She also stated the obvious conclusion that the Claimant's inability to understand written and spoken English would not prevent him from returning to such work. She noted that it is an unskilled occupation which is learned after observing a visual demonstration of the job duties, and, thus, his illiteracy did not and would not interfere with the performance of the job.

*(Tr. 25).* The The ALJ, of course, based his evaluation of Ms. Trudeau's conclusions on the hypothetical questions set forth on pages nine through 11 of this Order. Norng objected to the ALJ's reliance on the vocational expert's conclusions because hypothetical questions "should precisely set out the claimant's particular physical and mental impairments." *Tennant v. Schweiker,* 682 F.2d 707, 711 (8th Cir.1982). The Secretary responded that "(a) vocational expert's response to a hypothetical question provides substantial evidence where the hypothetical question sets forth with reasonable precision the claimant's impairments" *Starr v. Sullivan,* 981 F.2d 1006, 1008 (8th Cir.1992), and that it does not need to include all of the impairments a claimant alleges, but instead only has to include those impairments which the ALJ determines actually exist. *Onstad v. Shalala,* 999 F.2d 1232 (8th Cir.1993).

■ The court has researched this issue and has determined that both parties are correct. As the Eighth Circuit stated recently in *House v. Shalala,* 34 F.3d 691 (8th Cir.1994), "(w)hile it is clear that 'questions posed to vocational experts ... should precisely set out the claimant's particular physical and mental impairments,'" *Greene v. Sullivan,* 923 F.2d 99, 101 (8th Cir.1991),[22] a proper hypothetical question "is sufficient if it sets forth the impairments which are accepted as true by the ALJ." *House,* 34 F.3d at 694 (citing *Roberts v. Heckler,* 783 F.2d

110, 112 (8th Cir.1985)). Accordingly, this court's analysis of the appropriateness of the ALJ's hypothetical question involves a determination of whether the impairments accepted by the ALJ were appropriate.

When asked to assume that all of the impairments Norng complained of were true, including an inability to alternate sitting and standing for eight hours and a weight limitation of two to three pounds, vocational expert Trudeau testified that Norng could not return to any of his past relevant work, either as a meat trimmer or as a farmer. *(Tr. 88).* When asked to assume that Norng could sit, stand and walk without restriction and could lift and carry up to 50 pounds, however, she testified that he could return to his work as a meat trimmer. *(Tr. 88–9).* When asked to assume that Norng could sit, stand and walk without restriction and could lift and carry up to 25 pounds, vocational expert Trudeau testified that he could still return to his past relevant work as a meat trimmer. *(Tr. 89).* Finally, when asked to assume that Norng could sit, stand and walk without restriction and could lift and carry up to 25 pounds, but should not "engage in constant cycles of bending beyond 45 degrees [and] should not engage in frequent changes of posture from sitting to standing." *(Tr. 90),* with difficulty in his right arm movement so that he "should not engage in constant reaching above his shoulder level" *Id.,* Ms. Trudeau again testified that he could return to his meat trimmer job.

During his exchanges with the vocational expert, the ALJ never established the basis for the 25 or 50 pound weight restrictions he included in his hypothetical questions, nor the basis for the unrestricted sitting, standing and walking status. Similarly, in his decision, the ALJ pointed to nothing in the record which establishes that Norng can lift up to either 25 or 50 pounds, or can sit, stand or walk without restriction. The court has reviewed the record and has been unable to unearth any medical reports or vocational testimony which verify those assumptions.

---

**22.** See also *Smith,* 31 F.3d at 717 (quoting *Ledoux v. Schweiker,* 732 F.2d 1385, 1388 (8th Cir.1984) *which, in turn,* quoted *Tennant,* 682

F.2d at 711); *see also Totz v. Sullivan,* 961 F.2d 727, 730 (8th Cir.1992).

Hence, there was no basis in the record for the parameters articulated by the ALJ. Instead, all the ALJ had before him was a series of medical reports (as set out above) which stated that Norng felt pain for which it was difficult to establish an objective medical explanation. As the Eighth Circuit stated recently,

> (u)nless the hypothetical question comprehensively describes the limitations on a claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant. Testimony elicited by hypothetical questions that do not relate with precision all of a claimant's impairments cannot constitute substantial evidence to support the Secretary's decision.

*Smith,* 31 F.3d at 717 (citing *Ekeland v. Bowen,* 899 F.2d 719, 722 (8th Cir.1990)). Based on the foregoing, the court does not find that the vocational expert's testimony constituted substantial evidence and the ALJ should not have relied on her determination that Norng could return to his past relevant work because there was no basis for the weight restriction which the ALJ had articulated.

### III.  CONCLUSION

The medical evidence in the record does not establish that Norng is disabled. However, under *Polaski* and its progeny, this lack of objective evidence was not enough evidence, standing alone, for the ALJ to rely on to deny Norng's disability claim. Instead, the ALJ had a duty to do a credibility determination to establish that the record as a whole lacked substantial evidence of a disability. None of the issues cited by the ALJ constituted substantial evidence of no disability. The ALJ erred in discounting Norng's pain complaints based on Norng's ability to cook and shop, his ability to sit through two hearings without showing signs of pain, his son-in-law's testimony, and alleged inconsistencies regarding Norng's pain between December 1, 1992 and May 20, 1993, and between November 3, 1992 and November 10, 1993. He also inappropriately discounted Norng's pain complaints based on a perception that Norng had an impermissible motivation for receiving benefits. Further, the ALJ inappropriately relied on the vocational expert's answers to hypothetical questions because those questions were flawed.

Accordingly, the ALJ's determination that Norng was not disabled was not supported by substantial evidence in the record. Since the main problem with the ALJ's analysis had to do with his failure to fully and fairly develop the record, the court is persuaded that this case should be reversed and remanded. *Shelltrack v. Sullivan,* 938 F.2d 894, 898 (8th Cir.1991) (remand appropriate to allow the ALJ to fully and fairly develop the record regarding claimant's alcoholism).[23] Upon remand, the ALJ is to supplement the record as follows:

1. The ALJ is to supplement the record with information concerning Norng's every day activities and determine, after a complete review and a clarification of his cooking and shopping capabilities, whether his every day activities demonstrate a disability;

2. The ALJ is to supplement the record with information with respect to Norng's actual motivation for claiming a disability. Although he did say that he is taking care of his wife, there is nothing in the present record demonstrating that his desire to care for his wife outweighs his pain;

3. The ALJ is to supplement the record with an objective medical determination as to whether Norng's ability to sit, stand and walk is unrestricted. Because the ALJ determined that Norng had the functional capacity to return to his past relevant work based on this assumption, he should have

---

**23.** This Court would call Norng's attorney's attention to the recent United States Supreme Court decision in *Shalala v. Schaefer,* — U.S. ——, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993) which holds that a remand under sentence four of 42 U.S.C. Section 405(g) is a final judgment such that the 30–day period for filing an application for fees under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, begins immediately upon expiration of the time for appeal of the remand.

some objective basis for that assumption;

4. The ALJ is to supplement the record with an objective medical determination as to whether Norng is capable of lifting 25 to 50 pounds repeatedly throughout the day. Because the ALJ determined that Norng had the functional capacity to return to his past relevant work based on this assumption, he should have some objective basis for that assumption, as well.

For the reasons set forth above, judgment shall be entered reversing and remanding this case to the Secretary for further review.

**IT IS SO ORDERED.**